### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| JOANNA KOLLINTZAS and THESPENA KOLLINTZAS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 2:06 CV 040 |
| | ) | |
| GEORGE PABEY, individually and in his official capacity as Mayor of the City of East Chicago, Indiana, FERNANDO M. TREVINO, HENRY L. GILLIS, RUBY P. FLOWERS, and RUDOLPH P. LOPEZ, individually and in their official capacities as Members of the Board of School Trustees of the School City of East Chicago, Indiana, JOHN FLORES, individually and as former Superintendent of the School City of East Chicago, Indiana, ELAINE MARTINEZ, individually and as Director of Human Resources of the School City of East Chicago, Indiana, and the SCHOOL CITY OF EAST CHICAGO, INDIANA, an Indiana School Corporation, and the CITY OF EAST CHICAGO, INDIANA, a municipal corporation, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

### <u>MEMORANDUM OPINION AND ORDER</u>

Joanna Kollintzas and her daughter, Thespena Kollintzas, filed this suit in 2006, claiming they were fired from their positions at the School City of East Chicago ("School City") in violation of the United States Constitution. Their First Amended Complaint [DE40] asserts that the Mayor of the City of East Chicago, Defendant George Pabey, and the City itself conspired with and acted through the School City, four of the five members of the School City's Board of School Trustees (the "School Board"), and two of its high-ranking employees to terminate the Plaintiffs. (1st Am. Compl. ¶1.) Their terminations were allegedly "on account of and in

retaliation for their political support for former Mayor Robert A. Pastrick, . . . in retaliation for the support of Pastrick by [Plaintiffs' husband and father, respectively] Frank Kollintzas, . . . [and] on account of their race." (*Id.*) Plaintiffs seek a declaratory judgment, a permanent injunction reinstating them to their previous positions, compensatory damages, punitive damages, attorneys fees, and litigation expenses for these alleged violations of the Plaintiffs' First Amendment rights, pursuant to 42 U.S.C. § 1983, and equal protection rights under the Fourteenth Amendment, pursuant to 42 U.S.C. § 1981. (*Id.*)

This matter is before the Court on the School City of East Chicago Defendants' Motion for Summary Judgment [DE51] and the Motion for Summary Judgment of Defendants the City of East Chicago, Indiana, and George Pabey [DE57].[1] Also before the Court is a long series of motions to strike and motions to supplement. For the reasons that follow, this Court will grant the motions to supplement, deny nearly all of the motions to strike, grant the motions for summary judgment with respect to Plaintiffs' race discrimination claims under § 1981 and with respect to all claims against Defendant Fernando M. Trevino, and deny the motions for summary judgment with respect to the remaining claims and defendants.

## BACKGROUND

A thorough review of the facts is necessary to place the present motions in context. The Court begins by providing some background regarding the parties and other relevant individuals, and then turns to the sequence of events that gave rise to this litigation.

---

[1]The School City of East Chicago Defendants include Defendants Fernando M. Trevino, Henry L. Gillis, Ruby P. Flowers, John Flores, Elaine Martinez, and the School City of East Chicago, Indiana. Unless specific reference is made to an individual defendant by name, these defendants will be referred to collectively as the "School City" or the "School City Defendants."

## I.      THE PARTIES AND OTHER INDIVIDUALS

The Plaintiffs are a white mother and daughter whose husband and father (respectively)
has long been deeply involved in City politics.  Plaintiff Joanna Kollintzas, the mother, was first
employed by the School City as a clerk in 1995.  (1st Am. Compl. ¶ 3.)  She later assumed a
position as a "facilitator-monitor for the Director of Special Education" in the School City.  (*Id*.)
The facilitator-monitor position had no policy-making or management responsibilities.  (*Id*. ¶
13.)  Rather, her job focused on scheduling and coordinating professional evaluations of children
who were candidates for the School City's special education programs and assisting the parents
of those children in navigating their way through the School City's processes.  (*Id*.)  Joanna
reported to the Director of Special Education.  (*Id*.)  Nothing in the record indicates that Joanna's
performance was anything less than satisfactory.

Plaintiff Thespena Kollintzas, Joanna's daughter, had worked for the School City off and
on since 1997.  (T. Kollintzas Dep. I at 5-6.)  Prior to her final position, Thespena had worked in
the School City part time doing secretarial work.  (*Id*. at 5.)  In the fall of 2004, Thespena
graduated from Purdue University Calumet with a degree in finance.  (*Id*.)  At that time, or
shortly thereafter, Thespena began working part-time in the School City's financial office.  (*Id*.
at 7-8.)  In March, 2005, when another employee in the financial office retired, Thespena was
offered a full-time position as an Accounts Payable Clerk, on a probationary basis.  (*Id*.)  This
position had no policy-making authority or management responsibilities, but rather primarily
"involved the handling of invoices and other papers in connection with the payment of the
School City's bills."  (1st Am. Compl. ¶ 14.)  Thespena was one of four Accounts Payable
Clerks, all of whom reported to the Treasurer, first Nadyne Kokot and then after some time in

August 2005, Ernie Dittmann.  (T. Kollintzas Dep. I at 11-12.)  Thespena successfully completed her 90-day probationary period around June 2005.  (*Id.* at 13.)  Although she had no other reviews, nothing suggests that Thespena's performance was deficient in any way.

Joanna's spouse, and Thespena's father, Frank Kollintzas was well-known and heavily involved in East Chicago politics for approximately 30 years, during 25 of which he was an East Chicago City Councilman.  (*See* Pls.' Mem. in Opp'n to the Sch. City Defs.' Mot. for Summ. J. [DE68] ("Plaintiffs' School City Response") at 8.)  Frank was politically aligned with former Mayor Pastrick.  (*Id.*; *see also* Ans. of City Defs. George Pabey & the City of E. Chi., Ind., to Pls.' 1st Am. Compl. [DE47] ("City Answer") ¶ 12.)  Plaintiffs allege that Frank "strongly opposed Pabey's election as Mayor and Pabey opposed Frank's candidacy for City Council in 2003."  (1st Am. Compl. ¶ 12.)  Indeed, Joanna testified that Pabey had a "vendetta" against her husband.  (J. Kollintzas' Dep. I at 83.)  However, Frank's career in East Chicago politics came to an end in 2004, when he was convicted of converting money from the City of East Chicago.  *See U.S. v. Kollintzas*, 501 F.3d 796, 798 (7th Cir. 2007).  Frank has apparently fled the country since his conviction, (*see* J. Kollintzas Dep. I at 24), and Joanna has filed for a dissolution of marriage, (*id.* at 106-07).

Defendant George Pabey, who is Hispanic, lived just three doors down from the Kollintzas.  (Pls.' Sch. City Resp. at 8.)[2]  Pabey initially ran against Mayor Pastrick for the Democratic primary in 2003.  (1st Am. Compl. ¶ 5.)  That election was contested and Pabey

---

[2]The testimony is not entirely clear on this point.  Joanna testified that, first, Pabey lived three doors down and then his son later moved in.  (*See* J. Kollintzas Dep. I at 29-30.)  As the Court must make all reasonable inferences in favor of the non-moving party at this point, the Court finds there is sufficient evidence for a jury to find that Pabey was aware of the sign in front of the Kollintzas house, which is discussed below.

ultimately won the Mayorship in a special election held on December 28, 2004 and became

Mayor the next day. (*Id*.) As Mayor, Pabey is the highest-ranking official for the City of East

Chicago. (*See id.* ¶ 26.) In addition, there is no dispute that he has the sole authority to appoint

members to the School City's Board of School Trustees, but those appointments must be

approved by the city council. (*See* Pls.' Mem. in Opp'n to Mot. for Summ. J. of Defs. City of E.

Chi., Ind., & George Pabey [DE67] ("Plaintiffs' City Response") at 7; Reply Mem. in Supp. of

Defs. the City of E. Chi., Ind., & George Pabey's Mot. for Summ. J. [DE96] ("City Reply") at 2-

3.) He does not, however, have the power to terminate School City employees; Indiana law

gives that power exclusively to the School Board. *See* I.C. 20-26-5-4(8).

The School City is a school corporation under Indiana law. At the time of the events in

this suit, its highest-ranking executive was its superintendent, Defendant John Flores. (1st Am.

Compl. ¶ 26.) Flores was assisted by another Defendant, Elaine Martinez, who was the Director

of Human Resources for the School City. (*Id*. ¶ 9.) Martinez was appointed by Flores, (*id*.) and

she began her service on August 22, 2005, (Martinez Dep. at 18). She reported directly to

Flores. (*Id*.) Both Flores and Martinez are Hispanic. (*See* 1st Am. Compl. ¶¶ 8-9.)

The School City is run by the School Board. The Board is composed of five members

who are appointed by the Mayor to staggered three-year terms. (*See* Mem. of Law in Supp. of

Defs.' the City of E. Chi., Ind., & George Pabey's Mot. for Summ. J. [DE58] ("City Brief") at 4.)

At the time of the firings in this case, the Board consisted of: Fernando M. Trevino, Henry L.

Gillis, Ruby Powell Flowers, Rudolph P. Lopez (all named defendants in this case), and Dr.

Elaine Kisisel. (*Id*.) Flowers and Lopez were appointed by Pabey to terms commencing on July

1, 2005. (*Id*.) According to Plaintiffs, Flowers, Lopez, Trevino and Gillis were all political

supporters of Pabey.  (1st Am. Compl. ¶ 19.)

Trevino, who is Hispanic, was the president of the School Board at the time.  (*See id*. ¶ 7.)  He was appointed by Pastrick and was a friend of Frank Kollintzas.  (*See* Pls.' Sch. City Resp. at 8.)  In fact, Frank Kollintzas was instrumental in having Trevino appointed to the Board. (Trevino Dep. at 12.)  Additionally, Trevino runs a company that contracted with the City of East Chicago for approximately $90,000 annually since 1999.  (*See* City Reply at 5 n.4.) Trevino denies having ever discussed specific school matters with Pabey; and denies having ever been asked to hire or fire anyone at the School City by Pabey.  (Trevino Dep. at 28 & 30-32.) There is no evidence Trevino was involved in recommending Plaintiffs' terminations. Moreover, because Trevino was president of the Board, and thus only had to vote when there was a tie among the other members, he did not vote to approve Plaintiffs' terminations.  (*See id*. at 36.)

Defendant Henry Gillis, who is black, (1st Am. Compl. ¶ 7), first joined the Board in November 1993, (*see* Gillis Dep. at 4).  He was on the Board at the time Plaintiffs were fired.  In addition, Gillis was "well-acquainted" with Frank Kollintzas.  (*Id*. at 78.)

Defendant Ruby Powell Flowers, who is also black, (1st Am. Compl. ¶ 7), was appointed to the Board by Pabey in July 2005, (*see* Pabey 7/11/2006 Dep. at 113).[3]  Flowers was a Pabey campaign supporter, (*see id*.), and was also appointed by Pabey to be the Director of Bus Transit

---

[3]The School City Defendants have moved to strike Plaintiffs' references to the depositions of Defendant Pabey and Alicia Rodriguez.  (*See* Sch. City Defs.' Mot. to Strike Depositions of Pabey and Rodriguez [DE85].)  The School City Defendants claim that, because the depositions were noticed for a different case involving the City, but not the School City, neither the School City nor anyone with similar motives had the opportunity to attend the deposition.  (*Id*.)  Because City was a defendant in the pertinent cases and its motives were sufficiently similar to the School City's here, the Motion is denied.

for the City, (*see* Pls.' City Resp. at 7).

Defendant Rudolph (Rudy) Lopez was appointed to the Board by Pabey at the same time as Flowers. (*See* Pabey 7/11/2006 Dep. at 113.) He was also a Pabey supporter during the campaign. (*Id*.) Lopez is Hispanic. (1st Am. Compl. ¶ 7.)

Although not named as a defendant, Elaine Kisisel was also a member of the Board at the time Plaintiffs were fired. Kisisel was a long-time member of the Board, having served nearly twenty years, and was appointed and reappointed by Pastrick. (*See* Kisisel Dep. at 4.) Given her involvement with the Board, Kisisel has been acquainted with the Kollintzas family for a long time. (*Id*. at 7.) Apparently, Kisisel was also involved in some colorful discussions on the Board and adamantly opposed Plaintiffs' terminations. (*See id*. at 15.) Kisisel is white. (*See* Pls.' City Resp. at 22.)

Ernest (Ernie) Dittmann is also white and, though not named as a defendant, was actively involved in the events that gave rise to this litigation. In August 2005, Dittmann became the School City's Treasurer after Nadyne Kokot was removed from that position. (*See* Dittmann Dep. at 12.) Prior to that time, Dittmann served as the deputy treasurer, a position he had filled since approximately 1993. (*See id*.)

Finally, Ted Kounelis was also actively involved in these events. At the time of the Plaintiffs' terminations, Kounelis was the Administrative Assistant to the Superintendent/Labor Relations, a position he had held since July 2004. (*See* Kounelis Dep. at 9.) Prior to that, Kounelis was a director of human relations for the School City. (*Id*. at 8.) Kounelis is Frank Kollintzas' first cousin. (*See id*. at 55.) Sometime after the pertinent events in this case, Kounelis was transferred out of the Administrative Assistant position to become a dean of students at a junior high school. (*Id*. at 4.) He currently serves as the interim principal at a

7

School City elementary school.  (*Id*.)

## II.    THE FIRINGS

The School City Board voted to terminate Plaintiffs' employment on September 15, 2005.  (*See* 1st Am. Compl. ¶ 4.)  Plaintiffs contend their terminations were the product of the combined efforts of Pabey, the City, the School City, and its Board to retaliate against the Plaintiffs for their support of Pabey's opponent in the election, and to retaliate either against Frank Kollintzas himself for his political activities or against the Plaintiffs for their support of Frank Kollintzas.  (*Id*. ¶ 1.)  Plaintiffs further allege that their firings were based on racial discrimination against whites within the City and the School City.  (*Id*.)

Not surprisingly, these firings took place within a larger context and resulted in quite a bit of discussion.  Specifically, the firings took place (1) after the Pabey-Pastrick Mayoral campaigns and elections; (2) after Pabey appointed two members to the School Board; (3) at least according to the Defendants, in the midst of a budget crisis within the School City; (4) upon the recommendation and vote of the School Board; and (5) before spurring several discussions among various people regarding why they occurred.  The Court briefly reviews those circumstances.

### A.      The Pabey-Pastrick Campaign

In 2003, Pabey ran against Pastrick, the incumbent mayor, in the Democratic primary.  (1st Am. Compl. ¶ 5.)[4]  As described above, Pastrick initially won, but Pabey challenged the result and eventually won a special election.

The campaigns leading up to the two elections were apparently bitter.  According to

---

[4]The allegations in Paragraph 5 of the First Amended Complaint are not disputed by the City.  (*See* City Ans. ¶ 5.)

Joanna, the Pabey campaign was largely an attack on the Pastrick administration.  (*See* J. Kollintzas Dep. I at 34.)  In fact, Joanna testified that the Pabey "campaign was out to smear [Frank Kollintzas], and Bob Pastrick, and . . . anybody that had anything to do with him."  (*Id*. at 30.)  In addition, the Pabey campaign allegedly promised to "take[] control over" the School Board.  (*See* Pls.' City Resp. at 6-7.)

For their part, the Plaintiffs were involved – although not heavily – in the elections.  Although Joanna did not wear political paraphernalia at the school because it was not allowed, (*See* J. Kollintzas Dep. I at 28), she did "[speak] for Pastrick among her friends and neighbors" and she "attended public functions" for him, (Pls.' Sch. City Resp. at 8).  Similarly, Thespena was not heavily involved in the campaign, but did "work[] for Pastrick at the polling place and wore campaign colors associated with Pastrick."  (*Id*.; *see also* T. Kollintzas Dep. I at 32.)  In addition, the Kollintzases had a Pastrick sign in front of their house (where both Plaintiffs lived).  (T. Kollintzas Dep. I at 32.)

**B.    Pabey's Interaction With The School Board**

According to Plaintiffs, part of Pabey's campaign platform was to "take control" over the School Board.  (*See* Pls.' City Resp. at 6-7.)  They allege that Pabey's initial plan was to require the School Board to be elected rather than appointed by the Mayor.  (*Id*.)  But Plaintiffs say Pabey abandoned this idea once he entered office and appointed Lopez and Flowers.  (*Id*.)  Instead, they accuse Pabey of trying to take over the Board via his appointments and manipulation of City contracts and other benefits.  (*Id*.)  Specifically, Plaintiffs point to Gillis' nephew's promotion from Bus Driver to Assistant Superintendent of Transportation, at a substantial pay increase, (*see* Pls.' Sch. City Resp. at 7; *see also* Gillis Dep. at 56), and the continuation of Trevino's company's contract with the City, which amounted to nearly $100,000

annually, (Pls.' Sch. City Resp. at 7), as evidence of how Pabey changed his strategy for "taking over" the School Board.  As a result, Plaintiffs assert that the School Board was nothing more than a "rubber stamp" for Pabey's wishes at the School City.  (*See* Pls.' City Resp. at 6.)

### C.      Financial Condition of School City

Defendants point out that the School City was "facing a budgetary crisis" during this period.  (*See* City Br. at 2; Sch. City of E. Chi. Defs.' Mem. in Supp. of Summ. J. [DE52] ("School City Brief") at 12-14.)  Flores testified that the 2005 budget problem was actually the continuation of budgetary issues that had been ongoing since 1998.  (*See* Flores Dep. at 10.) According to Dittmann, the School City's budget was approximately $80 million, with approximately $30 million coming from property taxes.  (Dittmann Dep. at 21.)  But the property tax formula used by the State of Indiana can sometimes result in delays in getting the revenue to the schools.  (*Id.* at 28.)  That delay, perhaps in combination with other factors, resulted in the School City's 2005 budget being approximately $2.2 million less than was anticipated.  (*Id.* at 36-37.)  Consequently, six months into the year the School City had already spent over half of its 2005 appropriations, (*see* City Br. at 2), and was "in jeopardy" of not making its December payroll, (*see id.* at 11).

Immediately after he assumed his position as Treasurer, Dittmann began to brainstorm ways to address the problem.  He ultimately concluded that the School City should take several measures, including a salary expense reduction of approximately $1 million (or approximately 30 positions); a review of the School City's medical insurance contracts; a delay of the December 30 payday until January 3; a transfer of general fund expenses to other funds; and requesting additional funds from the department of local government finance.  (*See* Dittmann Dep. at 37-39.)  Dittmann's recommendations were reduced to writing in a July 11

memorandum.  (*See* City Br. at 2.)  Dittmann also approached the newly-minted Board member

Lopez to discuss the School City's financial condition.  (*See* Lopez Dep. at 31-32.)  However,

according to Kisisel, when Dittmann approached the Board, he did not have specific cuts in

mind, but simply wanted to reduce the budget by $1 million.  (*See* Kisisel Dep. at 64; *see also*

Dittmann Dep. at 90-91.)  Around the same time, the new director of human resources, Martinez,

met with Dittmann and Flores to discuss the issue.  (*See* Martinez Dep. at 19-20.)

Also at this time, Kounelis and another School City employee, George Manous, were

working on their own solution to the financial problems.  (*See* Kounelis Dep. at 28-29; 31-32.)

Their plan provided for approximately $1.3 million in savings.  (*See* Pls.' City Resp. at 18.)

Some of those savings came from the terminations of three state and local politicians, who

apparently held minor, but lucrative, positions within the School City.  (*See* Kounelis Dep. at 28-

29; 31-32.)  Flores rejected the Kounelis-Manous proposal, in part because of political

sensitivities, noting that the plan "will never fly."  (*Id.*)  Dittmann never acted on their

recommendations.  (*See* Kisisel Dep. at 59-61.)

Given the rejection of the Kounelis-Manous plan, Plaintiffs are dubious of the School

City's purported financial crisis.  (*See* Pls.' City Resp. at 18.)  Plaintiffs point to more than

$200,000 in new salary expenses that the School City incurred during this time, as well as the

overall increase in School City employees from 2005 to 2006 as evidence that the School City

was not truly in a budgetary crisis.  (*See id*. at 18-19.)  Plaintiffs also note that, aside from the

Plaintiffs and the two others who were fired at the same time, no other School City employees

were terminated as a result of the budget issues.  (*See id*. at 19.)  Finally, Plaintiffs stress that

there was no official reorganization plan provided to the Board until January 2006.  (*See id*. at 8.)

### D.       Recommendation And Termination Of Plaintiffs

In August 2005, Dittmann, Martinez, and Flores decided to recommend to the Board that Plaintiffs' positions, as well as two others, be terminated.  (*See* City Br. at 3.)  Although Flores described the process of deciding whom to fire as a "collaborative effort," it is not clear that Dittmann and Martinez share that opinion.  (*See* Pls.' City Resp. at 8; *see also* Flores Dep. at 7.) Regardless of how one characterizes it, it appears that the actual steps were as follows: Dittmann recommended that Thespena be removed from his office, (*see* Dittmann Dep. at 76-77);[5] Flores and/or all three recommended that Joanna be terminated, (*see* Martinez Dep. at 25); and Martinez ultimately put the names on the personnel report that was given to the Board for its approval, (*see id*. at 25).

First, Dittmann's decision regarding the removal of Thespena was apparently as much about his decision to shuffle the Treasurer's office as it was about the budget.  According to Dittmann, when he accepted the position as Treasurer, he did so with the condition that he be allowed to reorganize the Treasurer's office and select those with whom he would work.  (*See* Dittmann Dep. at 35.)  In particular, Dittmann wanted to reduce the Treasurer's staff from 13 to 9, (*see id*. at 53), and wanted to retain only those with whom he had worked in the past, (*see id*. at 77-78).   Dittmann contends that Thespena did not make the cut because he had not worked with her, (*see id*. at 87), and because she was not the "best for the job," (*see* City Br. at 3). Dittmann further contends that no one suggested he fire Thespena.  (*See* Dittmann Dep. at 79-80.)  Dittmann claims he was "blindsided" by the subsequent retirements that came out of his

---

[5]Dittmann apparently did not actually recommend that Thespena be terminated, rather he just sought her removal from his office and made no recommendation as to what to do with her. (*See* Dittmann Dep. at 76-77 & 93-94.)  It is not clear how Dittmann's recommendation of the removal of Thespena morphed into her termination.

office, which opened up new positions that Thespena could have filled.  (*See id*. at 88.)

Plaintiffs take issue with Dittmann's rationale for recommending the removal of Thespena.  They note that at the time he made the recommendation Dittmann was aware of the anticipated retirements that would open spots within his department.  (*See* Pls.' City Resp. at 16.)  Moreover, they challenge his rationale for removing Thespena, who has a degree in finance, and later transferring in a clerk who had only a high school education.  (*See id*.)  Furthermore, while Dittmann had not worked with Thespena up to that point, he had not worked with the new clerk whom he transferred in from her previous position as a library aide.  (*See id*. at 16; *see also* Pls.' Sch. City Resp. at 17.)  Finally, even if Dittmann genuinely did not know of the coming retirements, he nevertheless did not seek to reinstate Thespena after the openings became available.  (*See* Dittmann Dep. at 89-90.)

Second, according to Flores, he, Martinez, and Dittmann all worked together to make the recommendation to fire Joanna, which they claimed was a cost-cutting measure.  (*See* Flores Dep. at 7-8.)  Dittmann disputes this point, stating that he was not responsible for any recommendations outside of his department.  (*See* Dittmann Dep. at 52-53.)  Furthermore, Martinez also disputes this point, stating that the decision to recommend Joanna's termination came from Flores.  (*See* Martinez Dep. at 54.)  Regardless, Joanna's duties were absorbed by another employee, (*see* Trevino Dep. at 45; *see also* J. Kollintzas Dep. I at 26-27), and she was not given the opportunity to return to her job, (*see* Pls.' City Resp. at 19).

Third, Plaintiffs' names, along with two others – Larry Mamula and Georgia Kollintzas Stanojcic – were slated for termination "due to budget cuts" on the "items since" report for the September 15, 2005 Board meeting.  (*See* Sch. City of E. Chi. Defs.' Designation of Materials in Supp. of their Mot. for Summ. J. [DE55] ("School City Designations"), Ex. L (Sept. 15, 2005

13

Mem. from Martinez (01485)).)[6]  Georgia Kollintzas Stanojcic is also the daughter of Frank and

Joanna Kollintzas, and at the time she served as an office aide in the business department.  Larry

Mamula was a long-time friend of Frank Kollintzas, (*see* J. Kollintzas Dep. I at 40), who worked

as an aide in the fitness center.  Thespena and Mamula originally appeared on an "items since"

report for the August 30, 2005 meeting, (*see* Sch. City Designations, Ex. L (Aug. 30, 2005 Mem.

from Martinez (01480))) but that report was not approved at the August 30 meeting, (*see id*.

(Aug. 30, 2005 Mem. from Flores (01479))).  However, at the September 15 meeting, the Board

approved the terminations of all four.  The vote was 3 to 1, with Kisisel voting against, and

Trevino not voting, (*see* Trevino Dep. at 36).

### E.    Conversations

The terminations of the three Kollintzases and Mamula allegedly sparked several

conversations.  The first conversation was between Dittmann and Thespena.  (*See* Pls.' Sch. City

Resp. at 11.)  It appears that Thespena initially learned of her termination from a co-worker in

the personnel department named Lupe Rodriguez, who was also being transferred.  (*See* T.

Kollintzas Dep. I at 13-15.)[7]  That same day, Thespena talked with Dittmann.  (*Id*. at 20-21 &

24.)  Dittmann first apologized for the fact that neither Flores nor Martinez broke the news to

her.  (*Id*.)  According to Thespena, Dittmann then explained that "he was sorry for the way they

---

[6]An "items since" report is a list of all agenda items to be discussed that arose after the creation of the initial agenda for the meeting is created.  (*See* Gillis Dep. at 45.)

[7]Rodriguez had worked at the School City for approximately 25 years and also had a degree in finance.  (*See* T. Kollintzas Dep. I at 13-15.)  In addition, at the time Thespena was fired, there were three others in the business office: Joanie Janovsky, Liz Damjanovic, and Beverly McKenzie.  (*Id*. at 16.)  Thespena believes that all three were also transferred around this time.  (*See id*. at 17.) At about the same time, Mildreen Thomas, Madelene Spann, Crystal Leone, and Joy Warner were also hired in the department.  (*See id*. at 17-18.)

were handling things, because he knew [she] was in a political family all [her] life, and that it was a shame they were using this as retaliation to [her] father." (*Id*. at 21.)  While Dittmann did not mention Pabey, Thespena inferred from his comments that Pabey was the one "retaliating." (*Id*. at 22.)  For his part, Dittmann admits some of Thespena's version of the conversation.  (*See* Dittmann Dep. at 94-96.)  He acknowledges telling her that she "was a victim of the old political regime," but claims he was referring to their refusal to give her opportunities to work with him; and he denies saying that the firings were "retaliation."  (*Id*.)  He also suggested to Thespena that she might have more success if she left East Chicago.  (*Id*. at 100.)

The second conversation was between Kounelis and Flores.  According to Kounelis, he went to Flores and demanded an explanation shortly after the terminations.  Kounelis claims that Flores told him that he "had nothing to do with [the firings]" and that it was "[o]ver [his] head" because the decision had come from "city hall."  (Kounelis Dep. at 56.)[8]  While Flores did not tell Kounelis that Pabey or anyone in particular sent the order, or what the rationale was for it, Kounelis assumed that the comment indicated that the order came from Pabey.  (*Id*. at 57.)  That perception was likely bolstered by a prior conversation between Kounelis and Flores in which Flores indicated that there would be changes in the School City after Pabey's election.  (*See id*. at 44-46.)

Flores was also confronted by Kisisel.  (*See* Pls.' City Resp. at 9.)  According to Kisisel, when she demanded an explanation from him, Flores denied responsibility.  (*See* Kisisel Dep. at 88-91.)  Kisisel testified that Flores told her that he "was told" to fire the Kollintzases, but he refused to say who gave him that command.  (*Id*. at 88-89.)

---

[8]Not surprisingly, Flores denies making these statements.  (*See* Flores Dep. at 42.)

Finally, in October 2005, while at a party at a teacher's house, Kounelis questioned Trevino about the firings.  (*See* Kounelis Dep. at 69-71.)  According to Kounelis, Trevino told him that he also "had nothing to do with [it and that it] all . . . took place with the changing of the guard with the new board."  (*Id*. at 71)  But Trevino said nothing about Pabey.  (*Id*. at 69-71.)

### DISCUSSION

Plaintiffs claim the Defendants "intentionally and unlawfully retaliated against the Plaintiffs for the exercise of their rights to free speech, association and the support of the political candidates of their choice in violation of the First Amendment."  (1st Am. Compl. ¶ 22.)  Plaintiffs also contend their terminations were in violation of the equal protection guarantees of the Fourteenth Amendment because they were racially discriminatory.  (*Id*. ¶ 1.)  Plaintiffs charge that Pabey "entered into an agreement with Defendants Flores, Martinez and the School Board to discharge the Plaintiffs and to hire other personnel in furtherance of his political agenda."  (Pls.' City Resp. at 3.)  Pabey secured the agreement by appointing two of the Board members and providing "substantial benefits" to some of those he did not appoint in order to assure "their continuing cooperation" in many of the close personnel votes.  (Pls.' Sch. City Resp. at 3.)  In that way, Pabey orchestrated what "amounts to a political take-over of the School City."  (Pls.' City Resp. at 3.)  Thus, Plaintiffs argue, there was a "pattern of systematic employment of persons who were close associates [and] supporters or relatives of George Pabey," and Pabey instigated "the transfer or demotion of administrators at the highest levels of the School City who had supported Pastrick and Frank Kollintzas, including the terminations of three members of the Kollintzas family from School City employment."  (Pls.' Sch. City Resp. at

16

2-3.)[9]  Plaintiffs therefore assert a cause of action under 42 U.S.C. § 1983.[10]

In addition, Plaintiffs contend they were discriminated against on the basis of their race because "Pabey, Flores, Martinez, and the Board hired, almost entirely, Hispanic persons in significant posts and discriminated against white persons by literally purging the School City Administration of all high-ranking Caucasian employees, save one."  (Pls.' City Resp. at 4.) Furthermore, Plaintiffs contend that Pabey's decision to "tak[e] jobs away from the White minority [in East Chicago] and handing them to the Hispanic majority," Pabey aimed to

---

[9]Plaintiffs refer to other cases filed in this District, (*see* Pls.' City Resp. at 17-18) and specifically incorporate several of their appendices of material facts, (*id.* at 18 n. 3.) Furthermore, Plaintiffs seek to formalize some of this incorporation in their first motion to supplement.  (*See* Pls.' Mot. to Supplement their App. of Material Facts [DE112].)  The School City Defendants moved to strike Plaintiffs' references to those cases, (*see* Sch. City Defs.' Mot. to Partially Strike Incorporation of Various Docs. Contained in Pls.' Mem. [DE87]; Sch. City Defs.' Mot. to Strike References to Other Pending Cases [DE91]), and opposes Plaintiffs' motion to supplement, (*see* Resp. in Opp'n to Pls.' Mots. to Supplement [DE116]).  The Court will grant Plaintiffs' motion to supplement.  However, the Seventh Circuit has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them."  *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003).  This Court cannot be expected to scour both this record and the records of five other cases – especially when the records of the other cases are not even provided to the Court by the party citing them.  Similarly, this Court will not somehow incorporate the facts of those cases into the present litigation without a specific citation.  This Court will, however, take judicial notice of the fact that several other cases have been filed in this District against the City.  Therefore, the Court grants the School City Defendants' motions insofar as they strike references to the appendices and the facts of those cases that have not been specifically cited, but deny the motions in all other respects.

[10]Section 1983 provides, in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

"reinforce their loyalty to his organization and foster support for his goals."  (*Id*. at 21.)  Thus, Plaintiffs claim a violation of 42 U.S.C. § 1981.[11]

The City Defendants and the School City Defendants each filed motions for summary judgment [DE51 & 57].  Plaintiffs filed their responses to both motions [DE67 & 68] and a motion to strike the Defendants' statements of fact [DE73].  Defendants then filed their replies. [DE83 & 96].  The School City Defendants also filed ten motions to strike [DE84-94].  The parties have briefed the motions to strike, and Plaintiffs have also added two motions to supplement the record [DE112 & 113].  In addition, on August 15, 2007 the Court held an oral argument regarding the dispositive motions [DE117].  Being fully informed of the parties' positions, the Court is now prepared to dispose of the various motions.  The Court focuses its analysis on the summary judgment motions, and addresses the ancillary motions as necessary.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56©.  A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986).  In making this determination, a court construes "all facts and reasonable inferences from the record in the light most favorable to [ ] the non-moving party."

---

[11]Section 1981 provides, in pertinent part:

All persons within the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts . . . and to the full and equal benefit of all laws . . . as is enjoyed by white citizens . . . .

42 U.S.C. § 1981(a).

*Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 900 (7th Cir. 2005).

## I.     FIRST AMENDMENT CLAIMS UNDER SECTION 1983

The First Amendment protects public employees from suffering adverse job actions because of their political beliefs and associations.  *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 71 (1990); *Elrod v. Burns*, 427 U.S. 347, 359 (1976) ("The threat of dismissal for failure to provide [political] support unquestionably inhibits protected belief and association, and dismissal for failure to provide support only penalizes its exercise.").  Although an exception exists for actions taken against "policymaking" or "confidential" employees, *see Carlson v. Gorecki*, 374 F.3d 461, 464 (7th Cir. 2004), these Plaintiffs – an aide in the special education program and an Accounts Payable Clerk – do not fall into that category.

In order to establish a *prima facie* case of politically motivated discharge, Plaintiffs must demonstrate that (1) their speech was constitutionally protected; (2) they have suffered a deprivation likely to deter free speech; and (3) their speech was at least a motivating factor in the action against them.  *See Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).  *See also Vose v. Kliment*, __ F.3d __, No. 07-1792, 2007 WL 3120091, at *4 (7th Cir. Oct. 26, 2007).  The burden on the Plaintiffs is not insignificant; "[a] disgruntled employee fired for legitimate reasons would not be able to satisfy his burden merely by showing that he carried the political card of the opposition party or that he favored the defendant's opponent in the election." *Nekolny v. Painter*, 653 F.2d 1164, 1168 (7th Cir. 1981).  If Plaintiffs are able to demonstrate that their political affiliation was a motivating factor in their terminations, the burden shifts to the Defendants to show that they had a legitimate, non-political reason for the terminations, *see Nelms v. Modisett*, 153 F.3d 815, 818 (7th Cir. 1998); *Selch v. Letts*, 5 F.3d 1040, 1042 (7th Cir. 1993), which Plaintiffs can then attempt to rebut, *see Massey*, 457 F.3d at 717.

19

Defendants argue that the First Amendment claims fail on multiple grounds.  As an initial matter, the City and Pabey claim they cannot be held liable under § 1983 because, they claim, neither the City nor Pabey "caused" Plaintiffs' terminations as is required under that Section.  (*See* City Br. at 6-8.)  Yet even if they can be held liable, both the City Defendants and the School City Defendants argue that Plaintiffs have failed to present a *prima facie* case under § 1983.  (*See id*. at 8-11; *see also* Sch. City Br. at 4-12.)  In addition, both sets of Defendants argue that, even if Plaintiffs have presented a *prima facie* case, they cannot overcome the legitimate, non-discriminatory justification for their terminations, *i.e.*, the need to cut costs due to School City's budgetary crisis.  (*See* City Br. at 11-12; *see also* Sch. City Br. at 12-14.)  Finally, the School City Defendants claim to be entitled to qualified immunity.  The Court will address each of these positions in turn.

### A.      Whether The City And Pabey Can Be Liable Under § 1983

The City Defendants argue that they cannot be held liable under § 1983.  They argue that, because they did not have the legal authority to cause Plaintiffs' deprivations under Indiana law, as required under § 1983, (City Br. at 7 (citing I.C. 20-26-5-4(8))), they did not subject Plaintiffs, or cause them to be subjected, to the alleged deprivations, (*see id*. at 6-8.)

The City Defendants' argument misses the mark.  They are correct that in order to be held liable under § 1983, a plaintiff must show that the municipality itself caused the deprivation.  *See Woods v. City of Mich. City*, 940 F.2d 275, 277-78 (7th Cir. 1991).  As *Woods* noted, "[i]t is only when the execution of the government's policy or custom inflicts the injury that the municipality may be held liable under § 1983."  *Id*. (quoting *City of Springfield, Mass. v. Kibbe*, 480 U.S. 257, 267 (1987); *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 694 (1978)) (quotations, alterations, ellipses omitted).  That liability can attach where the

20

"plaintiff's constitutional injury was cause by a person with final policy-making authority."
*Billings v. Madison Metro. Sch. Dist.*, 259 F.3d 807, 817 (7th Cir. 2001). Thus, in this case,
Plaintiffs need only show that the "execution of a government's policy or custom, whether made
by its lawmakers or by those whose edicts or acts may fairly said to represent official policy,
inflict[ed] the injury." *Monell*, 436 U.S. at 694. Whether an actor is a policy-maker is a
question of state law. *See Woods*, 940 F.2d at 278. Furthermore, although the decision-maker is
the person responsible for the decision, if that decision-maker was merely acting as the "cat's
paw" for another, the Seventh Circuit has held that the person for whom the decision-maker was
acting can be held liable. *See Rogers v. City of Chi.*, 320 F.3d 748, 754 (7th Cir. 2003).

Although the argument that the School City – not the City – took the allegedly unlawful
action and therefore only the School City was the decision-maker is strong, it misreads
Plaintiffs' theory. Plaintiffs argue that the final policy-maker for the City, Mayor Pabey,
bestowed substantial rewards from the City upon those on the Board that did his bidding. (*See*
Pls.' City Resp. at 2.) The Board, in turn, was merely the cat's paw, in terminating the Plaintiffs.
(*Id.*) Therefore, according to Plaintiffs, Pabey was able to bind the City because his actions – in
appointing Board members, in providing City jobs to Board members or their relatives, and in
supplying them contracts – could be "fairly said to represent official policy." *See Monell*, 436
U.S. at 694. Requiring certain personnel actions in order to receive those benefits from the City,
as Plaintiffs allege, should therefore open Pabey and the City to liability under § 1983 because
they allegedly did cause the Plaintiffs' deprivations.

**B.      Whether Plaintiffs Have Established A *Prima Facie* Case**

All Defendants claim that Plaintiffs have failed to establish a *prima facie* case. (*See* City
Br. at 8-11; *see also* Sch. City Br. at 4-12.) Defendants' primary contention with respect to

21

Plaintiffs' *prima facie* case is that the Plaintiffs fail to show a genuine issue of material fact regarding whether Plaintiffs' protected activities were a motivating factor for their terminations. (*See id*.)  Based on the evidence produced in this case, the Court finds that Plaintiffs have demonstrated such an issue.

### 1.       Plaintiffs' protected speech

As noted above, the first element for which Plaintiffs must produce evidence is that they engaged in constitutionally protected conduct.  *See Massey*, 457 F.3d at 716.  *See also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Vose*, __ F.3d __, No. 07-1792, 2007 WL 3120091, at *4.  The constitutional rights involved must belong to the Plaintiffs, not another party.  *See Shondel v. McDermott*, 775 F.2d 859, 864-66 (7th Cir. 1985).  *See also Smith v. Frye*, 488 F.3d 263 (4th Cir. 2007), *cert. denied*, 76 U.S.L.W. 3113, (U.S. Nov. 26, 2007) (No. 07-360).  Plaintiffs argue that they themselves were "active in East Chicago politics," (*see* Pls.' City Resp. at 17), and the evidence provides a sufficient basis to support that claim.  Both Plaintiffs have testified that they engaged in political expression supporting the Pastrick campaign – even if that expression was a modest amount. (*See* J. Kollintzas Dep. I at 28-29 (discussing Joanna's activities); T. Kollintzas Dep. I at 32 (discussing Thespena's activities).)  Plaintiffs have therefore satisfied the first element with respect to their own personal conduct.

### 2.       Deprivation

There can be little dispute – and the parties really do not dispute – that there is sufficient evidence for a jury to determine that Plaintiffs suffered a deprivation.  Plaintiffs were fired from their positions at the School City.  If the other elements are satisfied, that is enough to establish a § 1983 suit.

However, Plaintiffs have produced no evidence that Defendant Trevino caused them any deprivation.  There is no evidence that Trevino was involved in recommending the Plaintiffs for termination.  Nor is there evidence that Trevino approved of the recommendation.  In fact, Trevino did not cast a vote on that issue.  (*See* Trevino Dep. at 36.)  Consequently, the Court finds that there is no genuine issue of material fact with respect to whether Defendant Trevino infringed upon the Plaintiffs' First Amendment rights; and the Court will therefore grant summary judgment in his favor.

### 3.    Motivating factor

The final element in establishing a cause of action for political discrimination under § 1983 is demonstrating that the Plaintiffs' protected activities were a "substantial or motivating factor" in their terminations.  *See Massy*, 457 F.3d at 717.  *See also Simmons v. Chi. Bd. of Educ.*, 289 F.3d 488, 495 (7th Cir. 2002); *Garrett v. Barnes*, 961 F.2d 629, 632 (7th Cir. 1992).  The Seventh Circuit has noted that "a motivating factor does not amount to a but-for factor or to the only factor, but rather is a factor that motivated the defendant's actions."  *Massey*, 457 F.3d at 717 (quotation marks and alterations omitted).  "[T]he plaintiffs are not required to come forward with direct evidence or the so-called smoking gun. . . . [c]ircumstantial proof, such as the timing of events or the disparate treatment of similar individuals, may be sufficient to establish the defendant's retaliatory motive."  *Id*. (quotation marks and citations omitted).[12]  Nevertheless, Plaintiffs may not simply "rely on the speculation or opinions of non-decision

---

[12]Plaintiffs contend that there is a series of factors that the Court should consider in determining the motivating factor, citing to *Felton v. Board of Comm'rs of the County of Greene*, 5 F.3d 198, 201-02 (7th Cir. 1993).  (*See* Pls. City Resp. at 12-13.)  *Felton* does not itself present a list of the factors to follow, rather the portion cited by Plaintiffs merely recites the factors considered by the district court in that case.  Therefore, this Court will consider the relevant facts, but will not consider *Felton* as presenting an exhaustive list.

makers as proof that Defendants fired [them] because of [their] political affiliation[s]." *Nelms*, 153 F.3d at 819. Furthermore, in order to prove that their protected conduct was a motivating factor, Plaintiffs must establish that the decision-makers knew of their conduct. *See Garrett*, 961 F.2d at 632.

The Court finds that there is sufficient evidence to create a genuine issue of material fact with respect to whether Plaintiffs' political activities were a motivating factor in the decision to terminate them. First, there is sufficient evidence for a reasonable jury to find that both sets of defendants were aware of the Plaintiffs' political activities. Plaintiffs' campaign activities – while not extensive – were open and public. Most notably, Plaintiffs had a Pastrick sign in their yard for all to see, including Pabey from his (or his son's) house three doors away. It is not likely that Pabey did not know or believe that the Plaintiffs were Pastrick supporters. At the least, there is a question of fact in that regard.

Second, there is at least some evidence to tie the Plaintiffs' activities to their terminations. Plaintiffs' theory is that Pabey commandeered the School Board by appointing his supporters and buying off others with City contracts, and then ordered Plaintiffs' terminations as retribution for their support for Pastrick. (*See* Pls.' Sch. City Resp. at 24.) There is evidence to establish such a connection between the City and the School Board. (*See, e.g.*, Gillis Dep. at 56 (discussing Gillis' nephew's promotion); Pls.' Sch. City Resp. at 7 (discussing Trevino's company's contract with the City).) Indeed, the timing of the firings supports this inference. Very shortly after Pabey got control of the School Board through two appointments, four people were fired; three of them had the last name "Kollintzas."

Furthermore, the four conversations noted above provide evidence that Pabey and the City were involved in the decision to terminate Plaintiffs. Specifically, the conversation between

Kounelis and Flores in which Kounelis claims Flores told him that the firings came from "City Hall," (Kounelis Dep. at 56) provides support for Plaintiffs' theory.  While it may well be that Flores never made the statement, or that a jury would not draw the same inferences from the statement as Plaintiffs, those are issues for the jury, not this Court on summary judgment.  The same is true for Flores' comment to Kisisel that he "was told" to fire the Plaintiffs, (Kisisel Dep. at 88-91), and Trevino's statement to Kounelis that the firings "took place with the changing of the guard with the new board," (Kounelis Dep. at 71).  Likewise with Thespena's alleged conversation with Dittmann, in which she claims he said that "he knew [she] was in a political family all [her] life, and that it was a shame they were using this as retaliation to [her] father." (T. Kollintzas Dep. I at 21.)

Thus, while Plaintiffs cannot "make [their] case on a nod, a wink, and the suggestion that '*we* know what those politicians are like'" or the mere "public perception of political machinations, innuendo, and speculation," *Garrett*, 961 F.2d at 634 (emphasis in original), that is not the case here.  Plaintiffs have statements – albeit of disputable veracity – from the decision-makers themselves from which a jury could make the necessary inferences.  Plaintiffs, therefore, have more than a nod and a wink; and the Court finds there to be a genuine issue of material fact with respect to this issue.

### C.        Whether Plaintiffs Can Rebut The Legitimate, Non-Discriminatory Reason

Because Plaintiffs have provided sufficient evidence of a *prima facie* case to survive summary judgment, "the burden [now] shifts to the defendants to produce evidence that they would have fired the plaintiffs even in the absence" of their political activities.  *Massey*, 457 F.3d at 717.  Both sets of defendants assert that Plaintiffs would have been terminated because of the School City's budget crisis; and they point to significant evidence of the School City's

financial problems.  (*See, e.g.*, *supra* at Background § II.C.)

Assuming Defendants have provided sufficient evidence, Plaintiffs must now "persuade a fact-finder that the defendants' proffered reasons were pretextual and that retaliatory animus was the real reason that the defendants fired them." *Massey*, 457 F.3d at 717.  "In the summary judgment context, this means that, to rebut the defendants' proffered explanations for their terminations, [Plaintiffs] must produce evidence upon which a rational finder of fact could infer that these explanations were lies." *Id*.

Plaintiffs have provided sufficient evidence to clear this hurdle.  There is evidence from which a reasonable finder of fact could conclude that the School City did not believe it was in such dire financial straits.  (*See supra* Background § II.C.)  Indeed, there is significant evidence that the School City actually increased many of its expenditures – including its payroll expenditures – during this time.  (*Id*.)  Moreover, Plaintiffs have provided evidence of an alternative cost-cutting proposal that would have saved their jobs, but was shelved.  (*Id*.)  Thus, because "the persuasiveness of an employer's non-retaliatory explanation ordinarily is for the finder of fact to assess," summary judgment should be denied here, where the Court cannot "say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point." *Massey*, 457 F.3d at 719 (quotation marks omitted).

**D.       Whether The School City Defendants Are Entitled To Qualified Immunity**

The School City Defendants also assert that they are entitled to qualified immunity because they "acted on **objective** considerations, not evaluations, reviews or other subjective input from anyone with alleged discriminatory intent."  (Sch. City Br. at 19 (emphasis in original).)

To determine whether an official is entitled to qualified immunity, [a court]

26

> look[s] to two issues.  First, taken in the light most favorable to the plaintiff, the
> facts must show the official violated a constitutional right . . . .  Second, we look
> to see if the right was clearly established at the time of the alleged violation.

*Vose*, No. 07-1792, 2007 WL 3120091, at *3.  *See also Billings*, 259 F.3d at 815-16; *Mitchell v.*

*Randolph*, 215 F.3d 753, 755 (7th 2000).  Those two criteria are met here.  As the Court has

already noted, there is evidence the School City Defendants violated Plaintiffs' constitutional

rights.  Moreover, Plaintiffs were fired in 2005, well after the seminal cases preventing political

discrimination.  *See, e.g.*, *Mitchell*, 215 F.3d at 757 (citing cases).

But the School City's argument is not so much that it did not know it could not

discriminate based on political beliefs.  Rather, the argument is that it should be given immunity

because it acted on hard financial data.  Yet that is the very essence of this case; and it is that

issue which must be decided by a jury; this Court cannot decide it on summary judgment, *see id*.

at 755 ("If resolution of a claim of qualified immunity depends on disputed issues of material

fact . . . it [must] await a full trial . . . .").

Because there are genuine issues of material fact with respect to Plaintiffs' claims under

§ 1983, Defendants' motions for summary judgment on those claims must be denied.  It does,

however, grant the School City Defendants' Motion with respect to Defendant Trevino.  The

Court now turns to Plaintiffs' § 1981 racial discrimination claims.

## II.    FOURTEENTH AMENDMENT CLAIMS UNDER SECTION 1981

Plaintiffs claim Defendants violated the Fourteenth Amendment and 42 U.S.C. § 1981 by

terminating them because of their race.  As with the § 1983 claim, Defendants contend that (1)

the City Defendants cannot be held liable under § 1981; (2) Plaintiffs have not presented

evidence of a *prima facie* case of race discrimination; (3) Plaintiffs cannot overcome

Defendants' legitimate, non-discriminatory reasons for their terminations; and (4) the School

City Defendants are entitled to qualified immunity.  Upon reviewing the materials, the Court

finds that, regardless of whether the City can properly be held liable under § 1981 in the absence

of a contract, Plaintiffs have not presented sufficient evidence to establish a *prima facie* case.

Therefore, summary judgment is proper with respect to these claims.

There are two ways to establish a *prima facie* case of race discrimination: the direct

method and the indirect method.  The Seventh Circuit has noted:

> The indirect method is the familiar burden-shifting test laid out in *McDonnell
> Douglas v. Green*, 411 U.S. 792 . . . (1973).  The direct method, on the
> other hand, requires the plaintiff to put forth evidence that demonstrates that she
> was a member of a protected class and *as a result* suffered the adverse
> employment action of which she complains. . . .   Under the direct method, a
> plaintiff must come forward either with direct or circumstantial evidence that
> points directly to a discriminatory reason for the employer's action. . . .

*Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 750 n. 3 (7th Cir. 2006) (quotation marks,

citations, and alterations omitted).[13]  *See also Blise v. Antaramian*, 409 F.3d 861, 866 (7th Cir.

2005); *Rogers*, 320 F.3d at 753-54.  Despite Plaintiffs' reference to "circumstantial evidence,"

(*see* Pls.' City Resp. at 21), they do not base their § 1981 claims on the direct method.  Plaintiffs

instead rely solely on the indirect method.

Under the indirect method, a plaintiff must show that she (1) is a member of a protected

class; (2) satisfied her employer's legitimate performance expectations; (3) suffered an adverse

employment action; and (4) was treated less favorably than another similarly situated individual

who was not in the protected class.  *See Burks*, 464 F.3d at 750-51.  *See also Simmons*, 289 F.3d

at 492.  In cases of reverse discrimination, like the present case, the first prong of the test is not

---

[13]While *Burks* is a Title VII case alleging race discrimination, Title VII claims are
analyzed under the same framework as § 1981 claims.  *See Patton v. Indianapolis Pub. Sch. Bd.*,
276 F.3d 334, 338 (7th Cir. 2002).

used.  *See Phelan v. City of Chi.*, 347 F.3d 679, 684 (7th Cir. 2003).  "In its stead, a plaintiff

must show background circumstances that demonstrate that a particular employer has reason or

inclination to discriminate invidiously against whites or evidence that there is something fishy

about the facts at hand."  *Id.* (quotation marks omitted).  *See also Hague v. Thompson Distr. Co.*,

436 F.3d 816, 820-21 (7th Cir. 2006); *Mlynczak v. Bodman*, 442 F.3d 1050, 1057 (7th Cir.

2006).

     Although Plaintiffs have provided sufficient evidence of the second and third prongs,

they do not provide sufficient evidence of their treatment compared to similarly situated

individuals, nor do they provide the requisite background circumstances.

     **A.**     **Whether Plaintiffs Have Demonstrated Background Circumstances**

     In order to establish their claim of reverse discrimination, Plaintiffs must first show that

the Defendants had reason or inclination to discriminate against whites; or else that there was

something "fishy" about this situation.  *See Hague*, 436 F.3d at 820-21; *Mlynczak*, 442 F.3d at

1057.  Plaintiffs attempt to make this showing by arguing that Pabey could reinforce his

influence within the Hispanic community "by taking jobs away from the White minority and

handing them to the Hispanic majority."  (Pls.' City Resp. at 21.)  Defendants note "[t]his *exact,*

*word-for-word* argument was used by plaintiffs' counsel in *Knight* but was rejected as 'purely

wild speculation.'"  (City Reply at 12 (quoting *Knight v. Pabey et al.*, No. 2:05cv191, slip op. at

27) (emphasis in original).)  This Court agrees with Judge Lozano's evaluation.  First, there is no

evidence in the record that any of the Defendants had such a motive.  Second, assuming

Plaintiffs' theory of voter behavior is correct, and even if the Defendants did intend to enhance

their political grip by distributing jobs, there is no reason why that distribution would be based

upon race: a voter of any race might be more inclined to support the administration that supplied

the job.  Plaintiffs do not explain why race might be important to this theory at all.

Even if it were not a flimsy theory upon which to find the necessary background circumstances, Plaintiffs lack the evidence to support it.  Unlike *Hague*, where five white employees were fired by a black boss and replaced by three black employees, 436 F.3d at 822, the role of race in the present case is not so stark.  Thespena lost her position in the financial office at the request of Dittmann, who is white.  While it is true that Dittmann claims he did not recommend her termination, he made the recommendation that she lose her job in his office.  (*See* Dittmann Dep. at 76-77 & 93-94.) Moreover, the changes in the financial office were not uniform with regard to race.  Thespena testified that Lupe Rodriguez, who is Hispanic, had been employed by the School City for approximately 25 years, and also had a degree in finance, was also removed from the finance department.  (*See* T. Kollintzas Dep. I at 13-15.)  Further, Thespena testified that there were four new employees in the office: Mildreen Thomas, Madelene Spann, Crystal Leone, and Joy Warner, at least two of whom were black.[14]  Similarly, Joanna's duties were absorbed by another employee – they were not given to a new Hispanic employee.  (*See* Trevino Dep. at 45; *see also* J. Kollintzas Dep. I at 26-27.)  Thus, Plaintiffs' theory simply does not comport with the facts of this case; and they therefore fail to meet the first prong of the modified *McDonnell Douglas* test.

---

[14]The racial classification of these employees is based upon the analysis conducted by Kounelis and Manous, which were part of Plaintiffs' Appendix of Material Facts Creating Genuine Issues in Opposition to Defendants' Motions for Summary Judgment [DE69-70].  The School City Defendants have moved to strike the Kounelis-Manous analysis [DE88 & 89].  The Court finds that there is a sufficient basis for their analysis.  For that reason, and for the reasons stated by the Court during the August 15 hearing [DE117], the Court denies the School City Defendants' Motions.

**B.      Whether Plaintiffs Present Evidence Of Similarly Situated Individuals**

Even if Plaintiffs could meet the other requirements of the *McDonnell Douglas* test,

Plaintiffs cannot establish that they were treated less favorably than similarly situated

individuals, as is required by the fourth prong.

> In order for an individual to be similarly situated to the plaintiff, the plaintiff must
> show that the individual is directly comparable to her in all material respects. . . .
> Factors relevant to this inquiry include whether the employees reported to the
> same supervisor, whether they were subject to the same standards and whether
> they had comparable education, experience and qualifications.

*Burks*, 464 F.3d at 751 (quotation marks and citations omitted).  *See also Patterson v. Avery*

*Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002).

Plaintiffs attempt to satisfy this prong by relying upon their suspicions of racial

discrimination and the Kounelis-Manous analysis.  (*See* Pls.' City Resp. at 22-23; Pls.' Sch. City

Resp. at 19-20.)  Because "the subjective beliefs of plaintiffs in employment discrimination

cases" cannot create a genuine issue of material fact, *see Mlynczak*, 442 F.3d at 1058, Plaintiffs

are left with the Kounelis-Manous analysis to salvage their claim.

The Kounelis-Manous analysis is woefully inadequate for that job.  In *Hague*, the

Seventh Circuit described the thorough analysis that is necessary:

> The plaintiffs must do more than merely point to race and proclaim: "Aha!
> Discrimination."  We stressed this point in *Millbrook v. IBP, Inc.*, 280 F.3d 1169,
> 1176-77 (7th Cir. 2002), wherein the plaintiffs attempted to create an inference of
> discrimination by pointing to "the fact that no blacks were hired during a two-
> year time frame. . . ."  We held in *Millbrook* that, at best, such evidence was
> anecdotal, and that we "cannot find discrimination on such a thin basis."  *Id*. at
> 1177 (quoting *Kuhn v. Ball State Univ.*, 78 F.3d 330, 332 (7th Cir. 1996)).  As we
> explained, if the plaintiffs rely on the racial composition of a workforce as
> evidence of discrimination it must "subject all of the employer's decisions to
> statistical analysis to find out whether [race] makes a difference."  *Id*. (quoting
> *Kuhn*, 78 F.3d at 332.)  <u>Thus, like *Millbrook*, without knowing how many
> positions became available during the relevant time frame, the number and race of
> the candidates applying for those positions, and the candidates' relative</u>

> qualifications, "[s]uch a list is next to worthless." *Millbrook*, 280 F.3d at 1177.
> *See also Odom v. Frank*, 3 F.3d 839, 849 (5th Cir. 1993) (raw data of age, race,
> and location of persons promoted from 1980-1983, "without more, is not
> competent to prove anything").  Lacking such evidence here, the plaintiffs' focus
> on the racial composition of the workforce is misplaced, both factually and
> legally.

436 F.3d at 829 (alterations in original; emphasis added).  This passage is directly on point.  The Kounelis-Manous analysis is merely a recitation of names, positions, races, and whether they were certified or non-certified employees.  (*See* Pls.' City Resp. at 23.)  Kounelis and Manous simply reviewed the School City's rosters for 2005 and 2006 to identify any changes.  They found a decline of approximately 7 percent in the number of white employees; a nearly 10 percent increase in the number of black employees; and an almost 12 percent increase in Hispanic employees.  (*Id.*)  But, this analysis spans only two years – one turnover cycle.  That alone makes the Kounelis-Manous analysis suspect under *Hague*.  436 F.3d at 829.  More importantly, Plaintiffs provide virtually no analysis of the relative qualifications of these employees versus white employees; no discussion of disparate treatment by supervisors; and no mention of the applicant pool from which these changes were made.  Finally, it fails to account for the negative treatment of seemingly equally (if not better) qualified Hispanics, such as Lupe Rodriguez.  Contrary to Plaintiffs' claims that this analysis is "exactly" what is required by *Hague*, (Pls.' Sch. City Resp. at 19), it is at best equal to the evidence in that case, which was "next to worthless," 436 F.3d at 829.[15]

Plaintiffs have wholly failed to provide evidence from which a reasonable jury could find that similarly situated individuals – *i.e.*, individuals that are "directly comparable to [Plaintiffs]

---

[15]This conclusion also holds for the specific assertions made by Plaintiffs regarding Joanna's job.  (*See* Pls.' Sch. City Resp. at 20.)

in all material respects," *Burks*, 464 F.3d at 751 (quotation marks omitted) – were treated more favorably than Plaintiffs.  The Court therefore finds that there is also no genuine issue of material fact with regard to the fourth prong of the *McDonnell Douglas* test, and thus summary judgment is appropriate.

## CONCLUSION

For the foregoing reasons, the Court finds that there are genuine issues of material fact with respect to Plaintiffs' political discrimination claims under § 1983.  Those issues include, but are not limited to:

•     Whether Plaintiffs were engaged in political activities protected by the First Amendment;

•     Whether Plaintiffs' political activities were a motivating factor in the School City's decision to terminate the Plaintiffs (which includes such issues as whether the Plaintiffs' political activities were known to the Defendants and whether the various conversations Plaintiffs allege took place did in fact occur);

•     Whether the City Defendants conspired with and acted through the School City Defendants to terminate the Plaintiffs;

•     Whether the Plaintiffs would have been terminated regardless of their political activities because of the School City's financial condition;

•     Whether Defendants' reliance on the School City's financial condition as a legitimate, non-discriminatory basis for Plaintiffs' terminations is pretextual;  and

•     Whether the Defendant School City Board Members, Flores, and Martinez are entitled qualified immunity.

Therefore, the Court hereby **ORDERS** as follows:

1.     Plaintiffs' Motion to Supplement their Appendix of Material Facts [DE112] is **GRANTED**, subject to this Court's decisions with regarding the School City Defendants' Motion to Partially Strike Incorporation of Various Documents Contained in Plaintiffs' Memorandum [DE87] and the School City Defendants' Motion to Strike References to Other Pending Cases [DE91];

2.     Plaintiffs' Second Motion to Supplement their Appendix in Opposition to Defendants' Motions for Summary Judgment [DE113] is **GRANTED**;

3.     Plaintiffs' Motion to Strike Portions of Defendants' Evidentiary Submissions in Support of their Motion for Summary Judgment [DE73] is **DENIED**;

4.      School City Defendants' Motion to Strike Portions of Plaintiffs' Appendix as Argumentative [DE84] is **DENIED**;

5.      School City Defendants' Motion to Strike Depositions of Pabey and Rodriguez [DE85] is **DENIED**;

6.      School City Defendants' Motion to Strike Evidence not Specifically Designated [DE86] is **DENIED**;

7.      School City Defendants' Motion to Partially Strike Incorporation of Various Documents Contained in Plaintiffs' Memorandum [DE87] is **GRANTED IN PART AND DENIED IN PART**;

8.      School City Defendants' Motion to Strike Declaration of Teddy Kounelis [DE88] is **DENIED**;

9.      School City Defendants' Motion to Strike Declaration of George Manous [DE89] is **DENIED**;

10.     School City Defendants' Motion to Partially Strike Plaintiffs' Appendix as Exceeding the Page Limitations Contained in Rule 7.1 [DE90] is **DENIED**;

11.     School City Defendants' Motion to Strike References to Other Pending Cases [DE91] is **GRANTED IN PART AND DENIED IN PART**;

12.     School City Defendants' Motion to Strike Portions of Plaintiffs' Appendix as Unsupported by Admissible Evidence [DE92] is **DENIED IN PART AND GRANTED IN PART**. The Motion is granted with respect to those items with which Plaintiffs have stated they have no objection. (*See* Pls.' Mem. in Opp'n to Mot. of School City Defs. to Strike Portions of Pls.' Appendix as Unsupported by Admissible Evidence [DE111].) Furthermore, the amendments requested by Plaintiffs in their memorandum [DE111] are **GRANTED**;

13.     School City Defendants' Motion to Strike Portions of Plaintiffs' Appendix as Unsupported by the Evidence [DE93] is **DENIED**, but the amendments requested by Plaintiffs in their Memorandum in Opposition to School City Defendants' Motion to Strike "As Unsupported by the Evidence" [DE104] are **GRANTED**;

14.     School City Defendants' Motion to Strike Portions of Plaintiffs' Memorandum in Opposition to Summary Judgment as Unsupported by the Evidence [DE94] is **DENIED**. The amendments requested in the Memorandum of Plaintiffs' [sic] in Opposition to School City Defendants [sic] Motion to Strike Portions of Plaintiffs' Memorandum [DE110] are **GRANTED**;

15.     School City of East Chicago Defendants' Motion for Summary Judgment [DE51] is **GRANTED IN PART AND DENIED IN PART**. Specifically, the School City Defendants' Motion is **GRANTED** with respect to Plaintiffs' race discrimination claims under 42 U.S.C. § 1981 and it is **GRANTED** with respect to Plaintiffs' claims against Defendant Fernando M. Trevino in their entirety. However, the School City Defendants' Motion is **DENIED** with respect to the political discrimination claims under 42 U.S.C. § 1983 against the remaining defendants; and

16.    Motion for Summary Judgment of Defendants the City of East Chicago, Indiana, and George Pabey [DE57] is **GRANTED IN PART AND DENIED IN PART**. Specifically, the City Defendants' Motion is **GRANTED** with respect to Plaintiffs' race discrimination claims under 42 U.S.C. § 1981 and it is **DENIED** with respect to the political discrimination claims under 42 U.S.C. § 1983.

17.    This matter is set for trial on **December 10, 2007 at 8:30 A.M.**

18.    The final pretrial conference set for Thursday, at 9:30 A.M. is hereby **VACATED**.

**SO ORDERED**.

ENTERED: December 3, 2007

s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT

35